ORAL ARGUMENT NOT YET SCHEDULED

BRIEF AND ADDENDUM FOR APPELLEE

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 21-3057

————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

CLARK CALLOWAY, JR.,                         Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
TEJPAL S. CHAWLA
* KATHERINE M. KELLY
D.C. Bar #447112
Assistant United States Attorneys

* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Cr. No. 17-0089 (RJL)          (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, Clark Calloway, Jr., and appellee, the United States of America. There are no intervenors or amici.

## Rulings Under Review

Calloway appeals from the judgment of the district court filed on August 10, 2021, following his August 9, 2021, sentencing by the Honorable Richard J. Leon. Calloway claims that the district court erred in imposing his sentence by applying a two-level upward departure pursuant to U.S.S.G. § 5K2.14.

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations other than those attached hereto are contained in the Addendum to the Brief for Appellant.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................ 1

    Factual Background ......................................................... 2

    The Guilty Plea ............................................................. 9

    The Sentencing ........................................................... 13

        The Government's First Sentencing Memorandum ................ 13

        Calloway's First Sentencing Memorandum ........................... 16

        Calloway's Supplemental Briefing ..................................... 17

        The Parties' Subsequent Filings ....................................... 18

        W7's Testimony ......................................................... 23

        The District Court's July 27, 2021, Memorandum Opinion ..... 24

        The Sentencing Hearing ............................................... 33

SUMMARY OF ARGUMENT ....................................................... 35

ARGUMENT ....................................................................... 36

    The District Court Did Not Err in Departing Upward Pursuant
    to U.S.S.G. § 5K2.14. ..................................................... 36

    A.   Standard of Review and Legal Principles .......................... 36

    B.   Discussion .......................................................... 39

        1.   The Court Properly Found That Public Safety Was
            Significantly Endangered. ........................................ 39

        2.   Applying the § 5K2.14 Departure Was Not
            Impermissible Double Counting. ................................ 47

CONCLUSION .................................................................... 53

# TABLE OF AUTHORITIES*

**Cases**

*Chavez-Meza v. United States,* 138 S. Ct. 1959 (2018)............................37

\* *Gall v. United States,* 552 U.S. 38 (2007) ...................................................36

\* *Koon v. United States,* 518 U.S. 81 (1996) ........................................28, 38

*United States v. Brevard,* 18 F.4th 722 (D.C. Cir. 2021).........................36

*United States v. Brown (Cary),* 9 F.3d 907 (11th Cir. 1993) ..................43

*United States v. Brown (Dawayne),* 892 F.3d 385 (D.C. Cir. 2018) .......37

*United States v. Ferguson,* 73 F. App'x 79, 2003 WL 21756639
  (5th Cir. June 24, 2003) .......................................................................43

*United States v. Joan,* 883 F.2d 491 (6th Cir. 1989) ..............................44

*United States v. McNeal,* 951 F.2d 364 (9th Cir. 1991)..........................52

*United States v. Moses,* 106 F.3d 1273 (6th Cir. 1997)...............31, 41, 45

*United States v. Nelson,* 296 F. App'x 475 (6th Cir. Oct. 10, 2008)...43-44

\* *United States v. Reese,* 2 F.3d 870 (9th Cir. 1993) .............................47-48

*United States v. Reis,* 369 F.3d 143 (2d Cir. 2004) .................................50

*United States v. Roth,* 934 F.2d 248 (10th Cir. 1991).......................39, 45

*United States v. Saani,* 650 F.3d 761 (D.C. Cir. 2011).............................37

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Singer,* 825 F.3d 1151 (10th Cir. 2016)........................30

*United States v. Terry,* 142 F.3d 702 (4th Cir. 1998)..............................38

*United States v. Todd,* 909 F.2d 935 (9th Cir. 1990).......................44-45

*United States v. Uca,* 867 F.3d 783 (3d Cir. 1989) ...........................51-52

*United States v. Vargas,* 73 F. App'x 746 (5th Cir. 2003)......................44

## Other References

18 U.S.C. § 2 ........................................................................ 1, 14, 41

18 U.S.C. § 922(g)(1)............................................................... 1, 52

18 U.S.C. § 922(g)(9) ...................................................................1

18 U.S.C. § 922(o)................................................................... 1, 13

18 U.S.C. § 924(a)(2) ....................................................................1

18 U.S.C. § 924(b)................................................ 1, 9, 14, 16, 40-42

18 U.S.C. § 3553 ........................................................................50

18 U.S.C. § 3553(a)........................................................... 15, 33, 50

18 U.S.C. § 3553(a)(2)..................................................................37

18 U.S.C. § 3553(b)(1)...................................................................37

18 U.S.C. § 3742(d)(2)....................................................................3

U.S.S.G. § 2K2.1 ................................................................... 13, 15

U.S.S.G. § 2K2.1(a)(3)(A)(ii) ...................................................... 31, 36, 49

U.S.S.G. § 2K2.1(b)(6)(B) ..... 13-14, 16-17, 26-28, 30, 32-33, 36, 47-48, 50

U.S.S.G. § 2K2.1, Application Note 4 ..................................................28

U.S.S.G. § 2K2.1, Application Note 7 ..................................................30

U.S.S.G. § 2K2.1, Application Note 11 ............................................ 49, 52

U.S.S.G. § 2K2.1, Application Note 11(D) ..........................................30

U.S.S.G. § 2K2.1, Application Note 14 ................................................28

U.S.S.G. § 3D1.2(a) ......................................................................13

U.S.S.G. § 5K2.0(a)(1)(A) ..............................................................37

U.S.S.G. § 5K2.0(a)(2)(A) ..............................................................38

U.S.S.G. § 5K2.0(a)(3) ..............................................................29, 38

U.S.S.G. § 5K2.0, Application Note 1 ..................................................41

U.S.S.G. § 5K2.6 ...........................................14, 18, 28, 31-32, 46-47

U.S.S.G. § 5K2.9 .................................................... 14, 18, 28, 32

U.S.S.G. § 5K2.14 ...........................15-16, 18, 28-30, 32-33, 35-36, 38-53

# Issue Presented

Whether the district court erred in sentencing Calloway by applying an upward departure under U.S.S.G. § 5K2.14, where the nature and circumstances of Calloway's weapons-related offenses showed that public safety was significantly endangered, and where that departure did not duplicate the sentencing concerns of U.S.S.G. § 2K2.1(a)(3)(A)(ii), which set the base offense level for involvement of a machine gun, and of U.S.S.G. § 2K2.1(b)(6)(B), which enhanced the offense level for possessing or transferring a firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 21-3057

————————————

UNITED STATES OF AMERICA,                          Appellee,

v.

CLARK CALLOWAY, JR.,                          Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

BRIEF FOR APPELLEE

————————————

## COUNTERSTATEMENT OF THE CASE

On May 9, 2017, Calloway was charged by indictment with: (1) interstate transportation of a firearm and ammunition (18 U.S.C. §§ 2, 924(b)) (Count 1); (2) unlawful possession of a firearm and ammunition (18 U.S.C. §§ 922(g)(1), (9)) (Count 2); and (3) illegal possession of a machine gun (18 U.S.C. §§ 922(o), 924(a)(2)) (Count 3) (Appendix for Appellant (A) 56-58). On October 18, 2018, Calloway pleaded guilty to the indictment before the Honorable Emmet G. Sullivan (A8).

On January 10, 2019, the government filed its sentencing memorandum and motion to depart upward from the sentencing-guidelines range (A100-142). Calloway filed his sentencing memorandum on January 29, 2019 (A143-160). After several rounds of supplemental briefing and hearings, the Honorable Richard J. Leon, to whom the case had been transferred, filed a memorandum opinion on July 27, 2021, granting in part and denying in part the government's requests (A283-300). Calloway was sentenced on August 9, 2021, to a concurrent 84 months of imprisonment, and a concurrent 36 months of supervised release, on each count (A18, A303-304). The judgment was filed the next day (A301-308), and Calloway noted a timely appeal (A309-310).

## Factual Background

In June 2016, the Federal Bureau of Investigation (FBI) began investigating Calloway—who had served in the Marine Corps from 1997-2001, where he received infantry and explosives training—based on information from an undercover FBI employee who had seen Calloway's

2

public Facebook account (A29 ¶ 7; Presentence Report (PSR) ¶¶ 7, 66).[1] That account contained pictures associated with jihad and terrorism, including persons walking with rocket launchers, machine guns, and other weapons, and persons carrying the black flag commonly associated with the Islamic State of Iraq and al Sham (ISIS) (PSR ¶ 6).

Calloway maintained three Facebook accounts (PSR ¶ 8). Through his second Facebook account, under the username "Alexander Dumas," Calloway "friended" on social-media sites several hundred people, who were "assessed to be ISIS fighters and sympathizers"; he joined numerous ISIS Facebook groups; and he posted pro-ISIS propaganda (*id.*). On January 1, 2017, Calloway established a third Facebook account under the username Clark Calloway, Jr. (*id.*).

---

[1] Calloway's PSR is available to this Court under 18 U.S.C. § 3742(d)(2). As Calloway acknowledges (at 4 n.1), the district court adopted the factual findings in paragraphs 6-20 and 23-29 of his PSR (A283-284 n.1). The court noted that Calloway had "lodged no objections to the factual accuracy of these paragraphs, and they recount Calloway's online activity and conversations with confidential informants—facts which Calloway has expressly represented that he does not dispute" (*id.*). Calloway also accepted as true his Facebook postings and recorded statements in communications with confidential sources (A229-230), many of which were cited in the affidavit in support of the criminal complaint (A26-55).

On his Facebook accounts, Calloway "made violent statements regarding jihad and violently establishing an Islamic Caliphate as declared by ISIS"; he "pledged his support to ISIS and its leader"; and he "urged others to engage in mass violence" (PSR ¶ 9). He also posted messages regarding "revolution against whites" and supporting "violence against police officers" (*id.*).

On September 17, 2016, an initial confidential source (CS1) developed an online relationship with Calloway through Calloway's "Alexander Dumas" Facebook account (PSR ¶ 10). Starting on that date, CS1 took screen shots of their conversations, in which Calloway indicated that he "hated white people, subscribed to Islamic extremist ideology, and would avail himself of the opportunity to conduct violent jihad," i.e., "holy war" (*id.*). Calloway stated, "I am a Mujahid," i.e., one engaged in a holy war (*id.*). CS1 and Calloway "communicate[d] regarding ISIS and domestic terrorism until September 30, 2016" (*id.*).

In November 2016, the FBI approached a second confidential source (CS2), whom Calloway had known since the summer of 2015, and CS2 agreed to work with the FBI (PSR ¶ 11). *Before* that FBI contact, in October 2016, Calloway had unsuccessfully attempted to buy an AK-47

firearm from CS2 (*id.*). CS2's phone listed Calloway's phone as a personal contact with the nickname "Brother Jihad," and CS2's phone contained text messages between CS2 and Brother Jihad (*id.*). For example, on October 8, 2016, CS2 texted "Brother Jihad" and sent him a photo of CS2 holding an AK-47 firearm (*id.*). In response, Calloway stated that he wanted to buy the AK-47 (*id.*). When CS2 refused to sell it, Calloway replied, "I wouldn't sell it either. That is a Kuffar killer! Viscous [sic]." (*Id.*)[2] Later in the text conversation, in discussing the firearm and ammunition, Calloway stated, inter alia, "If I had that I would start a revolutionary war!" (*id.*). Thereafter, when CS2 texted, "You don't need that," Calloway responded, "All I have is a machete" (*id.*).

On December 5, 2016, the FBI asked CS2 to offer Calloway a firearm similar to the one Calloway had previously expressed interest in buying (PSR ¶ 12). CS2 agreed and texted Calloway regarding the sale of a fully automatic M-16 machine gun with a sound suppressor, and included a photo of CS2 holding that weapon (*id.*). Calloway replied that he would call CS2 later (*id.*). When Calloway called CS2 minutes later,

---

[2] As the government later explained at Calloway's plea hearing, "Kuffar" means "non-Muslims" (A363).

5

he said he was interested in buying the weapon but currently could not afford it (*id.*). Although CS2 communicated with Calloway on several other occasions, Calloway did not buy a gun from CS2 (PSR ¶ 13).[3]

Before this, in October 2016, Calloway met, and became friendly with, a third FBI confidential source (CS3) (PSR ¶ 14). From January through March 2017, Calloway and CS3 communicated via text (*id.*). On March 10, 2017, CS3 informed Calloway that CS3 was bringing two M-16 rifles to CS3's brother, who wanted to buy a weapon (A41-42 ¶ 43). Calloway replied that he had used an M-16 rifle in the Marine Corps (*id.*).

On March 31, 2017, Calloway and CS3 met in person (PSR ¶ 14). CS3 told Calloway that CS3 could get weapons for $200, and Calloway stated, "Yeah, I want one of those" (*id.*). While in CS3's apartment, Calloway and CS3 watched a television documentary about ISIS in which a man demonstrated how to operate an AK-47 rifle (*id.*). Calloway told CS3 that he wanted an AK-47 (*id.*). CS3 said that CS3 could get an AK-

---

[3] Calloway notes (at 10 n.4) that on April 12, 2017, CS2 asked Calloway what he would do if he had a gun, and Calloway responded that he did not want it because he "got no heart for that" (A40 ¶ 37). But by then, Calloway had already arranged to buy, and had made a down payment on, an AK-47 from another confidential source, CS3. See *infra* pp. 6-7.

47 for $200, which would not be new or fully automatic, and that CS3 could only get one "clip" for the AK-47 (PSR ¶ 15). Calloway replied, "one clip is better than no clips," and arranged payments (*id.*) as stated infra at pp. 9-10. As discussed infra at pp. 19-22, in the period after telling CS3 he wanted an AK-47, Calloway made numerous menacing statements regarding his plans to attack others, including white people and police officers.

On April 1, 2017, CS3 texted Calloway, saying that CS3 could sell him a fully automatic AK-47 for $250 instead of the $200 semi-automatic AK-47 (PSR ¶ 16). Calloway replied, indicating his intent to buy the fully automatic AK-47 via installment payments (*id.*) as stated infra at p. 9.

On April 7, 2017, Calloway met with CS3 and said that he was going to give CS3 $60 as an initial payment for the AK-47 (PSR ¶ 17). CS3 agreed and told Calloway that CS3 would try to get him "extra clips and little bit of ammo" (*id.*). Calloway stated he wanted to use the AK-47 on "crackers" (*id.*). CS3 took Calloway to an ATM, where Calloway withdrew money, and Calloway paid CS3 $60 (*id.*).

When CS3 and Calloway met on April 22, 2017, Calloway indicated that he expected to pay the remaining $190 on April 28, 2017 (A45 ¶ 52).

CS3 confirmed with Calloway that once CS3 received the full payment, CS3 would arrange to transport the AK-47 from another state, and that Calloway could expect its delivery around May 4, 2017 (*id.*). As discussed infra at p. 10, thereafter Calloway paid the balance for the AK-47 and discussed its delivery with CS3.

On May 4, 2017, CS3 received from FBI agents outside the District of Columbia a fully automatic AK-47 with ammunition; law enforcement had previously disabled the AK-47 (PSR ¶ 19). CS3 then traveled with FBI agents into the District of Columbia with the AK-47 and entered the building where CS3 and Calloway had apartments (*id.*). CS3 texted Calloway that he could come to CS3's apartment (*id.*). When Calloway entered CS3's apartment, CS3 gave him the AK-47, which he accepted (*id.*). Calloway was arrested in possession of the AK-47 inside CS3's apartment (*id.*). A machete was recovered in Calloway's apartment (*id.*).

## The Guilty Plea

After the court denied his motion to dismiss the indictment,[4] Calloway entered a guilty plea to the indictment. Because there was no plea agreement, Calloway submitted his own factual statement in support of his guilty plea in which he acknowledged, inter alia, the following:

> On or about October 2016, Mr. Calloway met a "Confidential Source" (CS[3]) . . . . Thereafter Mr. Calloway and the CS[3] spoke periodically. Sometime around March 31, 2017, the CS[3] told Mr. Calloway that he could get weapons, including an AK-47. Mr. Calloway expressed interest in obtaining an AK-47 and told the CS[3] that he wanted an AK-47.

> The CS[3] told Mr. Calloway that he could get Mr. Calloway . . . a semi-automatic AK-47 for $200. In response Mr. Calloway arranged a payment plan in which Mr. Calloway would pay the CS[3] to acquire a semi-automatic AK-47 for Mr. Calloway. Mr. Calloway told the CS[3] he would be pay[ing] the CS[3] $100.00 on April 7, 2017, and would pay the remaining $100.00 on April 14, 2017.

> On or about April 1, 2017, the CS[3] informed Mr. Calloway by text that he could obtain and sell to Mr. Calloway a fully automatic AK-47 for $250.00. Mr. Calloway responded by indicating his intent to purchase the fully automatic AK-47 via installments of $100.00 and $150.00.

---

[4] Specifically, the district court rejected Calloway's argument that the indictment should be dismissed due to allegedly outrageous government conduct (A342-344), and denied his motion to dismiss the 18 U.S.C. § 924(b) count based on his claim of insufficient evidence (A346-348).

On April 7, 2017, Mr. Calloway met with a CS[3] and told the CS[3] that he was going to give the CS[3] $60.00 as an initial payment for the AK-47. The CS[3] took Mr. Calloway to an ATM and Mr. Calloway withdrew money. Mr. Calloway paid the CS[3] $60 and confirmed with the CS[3] that Mr. Calloway still owed $190.00. During that conversation Mr. Calloway stated that he wanted to use the AK-47 on "crackers".

On or about April 28, 2017, Mr. Calloway texted the CS[3] and informed the CS[3] that he had the remaining money for the AK-47. Later in the day, the CS[3] met with Mr. Calloway in the District of Columbia, and Mr. Calloway provided the CS[3] the remaining balance of $190 for the firearm. Mr. Calloway confirmed with the CS[3] that the CS[3] would bring the AK-47 the following week.

On May 4, 2017, the CS[3] received a fully automatic but disabled AK-47 with ammunition from FBI agents outside the District of Columbia. The CS[3] then traveled with FBI agents across state lines into the District of Columbia with the AK-47 and entered . . . the building where Mr. Calloway lived. The CS[3] informed Mr. Calloway via text message that Mr. Calloway could come over to the CS[3]'s apartment in the same building. Mr. Calloway entered the CS[3]'s apartment and he and provided the AK-47 to Mr. Calloway, who had already purchased the weapon in two payments totaling $250. Mr. Calloway accepted the firearm and he was immediately thereafter arrested.

After his arrest Mr. Calloway provided a voluntary statement to FBI agents. Mr. Calloway acknowledged providing the CS[3] $250 so that the CS[3] would purchase the AK-47 found in his possession. Mr. Calloway acknowledged he was aware that he could not possess a firearm because he was a felon. (A97-99.)

At the plea hearing, the government made its own factual proffer, in which it detailed Calloway's transaction obtaining the AK-47 from CS3

10

(A362-364). In addition to details of that transaction, the government proffered, inter alia, that on April 1, 2017, Calloway stated that he knew ISIS brothers on Facebook, and when CS3 asked if he would ever travel, Calloway stated there was "no need to travel overseas to fight for ISIS because the Kuffar is here" (A363). On April 14, 2017, CS3 asked Calloway, "What would be the best way to do something[?]" because Calloway had been in the military and knew the Kuffar tactics (A363). Calloway answered that he would do coordinated assaults like the Vietcong (A363). An earlier November 2016 Calloway post "had made comparisons between the Vietcong and ISIS, and Calloway told CS3, 'That's what you do, simultaneously have everybody in, like, four-man units all over the country attack police stations'" (A363). Calloway also said, 'But, yeah, just an all out assault on police stations, any police cruisers, everybody just like an offensive – like the Tet Offensive'" (A363).

The government noted that on April 28, 2017, "Calloway indicated that with respect to the AK-47, he was 'getting ready to do something here'" (A363-364). When CS3 asked what Calloway planned to do, Calloway said he had to go to the police, and that he did not want to target brothers, but he also said, "[i]f they don't get out of the F'ing way.

. . .'" (A364.) The government noted that Calloway then named a Metropolitan Police Department (MPD) police station (A364).

When the district court then asked Calloway whether he agreed that what the prosecutor had said was true, Calloway responded, "Um, for the most part. I honestly don't remember ever saying I was going to a police station and doing anything with a weapon." (A364.)[5] Thereafter, he stated, "But for the most part the paraphrasing is correct" (A364).

Calloway twice acknowledged that he was pleading guilty because he was guilty (A366, A379). The court accepted the guilty plea (A380).

---

[5] The government's third supplemental sentencing memorandum set forth the discussion between CS3 and Calloway regarding Calloway's plans upon getting the AK-47, which was part of an April 28, 2017, recorded call (A217-218). Therein, Calloway stated that he was "getting the joint out. They come down we gonna have to do something here. Like we talk about." (A217-218.) Calloway also said, inter alia, "We gotta go to the police huh?" and stated, "I don't want no brothers man but if they don't get out of the f***ing way . . . . (A218). He stated, "They most likely Kufar but you have some Muslims who are police. . . . Most of them are First District, I'm telling you." (A218.) When CS3 asked Calloway where First District was located, Calloway stated, inter alia, that it was "not too far from where I work from right now. Pennsylvania Avenue. . . ." (A218.) Calloway later agreed that the government had accurately quoted his April 28, 2017, discussion with CS3 (see A218 ¶ 21) (A230).

# The Sentencing

## *The Government's First Sentencing Memorandum*

In its initial sentencing memorandum, the government noted that under U.S.S.G. § 2K2.1, the PSR had calculated Calloway's base offense level as 22 for unlawful machine gun possession, in violation of 18 U.S.C. § 922(o), and had grouped his other two offenses pursuant to U.S.S.G. § 3D1.2(a) (A115). Applying a three-level reduction for acceptance of responsibility, the PSR had calculated a total offense level of 19, and applying Calloway's criminal history category III, the PSR had calculated a sentencing guidelines range of 37-46 months (A116). The government argued that a sentence within that range would be too low.

First, the government asserted that the Probation Office should have applied a four-level specific-offense-characteristic enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because the undisputed facts of the case showed that Calloway "possessed or transferred [the AK-47 and ammunition] with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense" (A116 (quoting U.S.S.G. § 2K2.1(b)(6)(B))). Among other things, the government cited numerous examples of Calloway's prior online posts and his

13

statements to CS1, CS2, CS3, and W4,[6] which showed that when he possessed the AK-47 and ammunition, he had the intent to commit another felony (A116). Furthermore, because Count 1 charged Calloway under 18 U.S.C. § 924(b) and 18 U.S.C. § 2 (causing an act to be done) (A57), the government argued that Calloway had the requisite intent when he caused the AK-47 to be transferred across state lines by paying CS3 for it (A116-117). The government asserted that contrary to the Probation Office's position, § 2K2.1(b)(6)(B) did not require a "substantial step" toward committing another felony (A118).

Second, the government asserted that upward departures were warranted under U.S.S.G. § 5K2.6 (Weapons and Dangerous Instrumentalities) (a one-level departure); § 5K2.9 (Criminal Purpose) (a

---

[6] In the summer of 2016, Calloway began contact with W4, who was not a law-enforcement member or a confidential source, and who spoke with law enforcement only after Calloway's arrest (A76). Calloway told W4 that a "war was coming" and he wanted a firearm for protection and could not legally obtain one due to his criminal record (A76). In October 2016, before CS2 began working with the FBI and several weeks after Calloway made contact with CS1, W4 told Calloway that W4 had several firearms, including a pistol (A76). Calloway asked W4 to come to Washington, D.C. for Thanksgiving and to bring Calloway a pistol (A76). W4 agreed, but ultimately chose not to travel to Washington, and never met Calloway in person (A76-77).

two-level departure); and § 5K2.14 (Public Welfare) (a two-level departure) (A102, A118-124).[7] The government further argued that an above-guidelines sentence was appropriate as a variance, under the factors of 18 U.S.C. § 3553(a) (A102, A124-128).

The government explained that U.S.S.G. § 5K2.14 provided that "[i]f national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense" (A122). The government asserted that a two-level departure was warranted because U.S.S.G. § 2K2.1, which governed Calloway's offense level, did not account for his intent to commit an ideologically driven mass-casualty event (A122, A124). First, Calloway intended to kill law enforcement officers, which would create a public safety risk for them and everyone in the zone of danger he created (A123). Second, Calloway intended to harm society and intimidate specific communities based on his ideology, which mixed hatred, racial animosity, and religious grievance (A123). The government noted that

---

[7] The government noted that applying all its requested provisions would result in a total offense level of 28 (after a three-level acceptance-of-responsibility reduction) and a guidelines range of 97-121 months (A116, A119, A124).

Calloway's Facebook posts and statements to CS2 and CS3 showed that he wanted to kill non-Muslims, cause a violent revolution against the government and social order, and intimidate police officers and white people (A123). Third, Calloway demonstrated that he wanted to do so with a fully automatic AK-47 with an extended ammunition clip in a short period "to create a memorable event against those he hated" (A123). The government noted that courts have properly applied § 5K2.14 where no harm directly resulted from the defendant's actions (A122).[8]

### *Calloway's First Sentencing Memorandum*

Calloway asserted that a § 2K2.1(b)(6)(B) enhancement was inapplicable because the AK-47 had been disabled and FBI agents took it from him quickly (A146). Furthermore, ignoring the provision's second clause,[9] he argued that § 2K2.1(b)(6)(B) applied only where a defendant

---

[8] It also noted that Calloway maintained his violent ideology after his arrest, as shown by statements he made while jailed with W7, who was not a government agent (A112-113). See infra pp. 23-24.

[9] The second clause of § 2K2.1(b)(6)(B) applies where a defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Calloway's indictment specified that the § 924(b) charge was based on his intent to commit a felony, and his causing the transport and his receipt of the firearm and ammunition

(continued . . . )

"used or possessed any firearm or ammunition in connection with another felony offense," and his statements about using the firearm were disconnected from his firearm possession (A147). He also claimed that because the government's sentencing requests were based largely on his statements, they violated the First Amendment (A148-149). Calloway requested a 37-month sentence, at the low end of the guidelines range as calculated without the government's requested enhancement and upward departures (A143). He sought leniency based on his work history and military service (A159).

## *Calloway's Supplemental Briefing*

In supplemental briefing, Calloway asserted that § 2K2.1(b)(6)(B) was inapplicable because the government could not prove that he intended to commit another felony offense with the firearm based on his "hyperbolic Facebook statements and conversations with two informants," noting that "any plans to commit an actual attack were inchoate" (A166-167). He argued that the court should not apply

---

with knowledge and reasonable cause to believe that a felony, i.e., assault with a dangerous weapon (ADW), was to be committed with those items (A56-57).

§§ 5K2.6, 5K2.9, or 5K2.14 because "suspicions and allegations which never translated into acts do not qualify as egregious acts that are outside the heartland of Guidelines cases" (A166). He argued that § 5K2.14 applied only where conduct endangered public welfare at the time of the act, not based on future dangerousness (A174-175). Also, Calloway asserted that although weapons offenses may support a § 5K2.14 departure, there must be an actual threat, which did not exist here given his brief possession of the disabled firearm (A175).

### The Parties' Subsequent Filings

At the district court's direction (A11, A412-413), on October 21, 2019, the government filed its "third supplemental sentencing memorandum," listing, in support of its enhancement requests, approximately 22 pages of statements Calloway made: (1) on his publicly available social-media accounts from March 5, 2014 to November 12, 2016 (A207-208, A217); (2) in texts and conversations with CS1 via Facebook from September 20-30, 2016, and Calloway's sharing on January 31, 2017, of pro-ISIS Facebook posts from CS1's Facebook page (A209-211); (3) in texts and phone calls with CS2 from October 8, 2016 to February 18, 2017, regarding guns, including an AK-47, and ammunition

(A211-213); (4) in texts with CS3 from January 26 to March 10, 2017 (A213-214); (5) during an in-person meeting with CS3 on March 31, 2017, in which CS3 and Calloway discussed Calloway purchasing an AK-47 and ammunition (A214-215); (6) in texts, recorded phone calls, and recorded in-person meetings with CS3 from April 1-28, 2017, in which CS3 and Calloway further discussed and transacted Calloway's purchase of an AK-47 and ammunition, including what Calloway planned to do with the AK-47 (A215-218); (7) in Facebook posts from March 31 to April 9, 2017 (A218-221); (8) in posts from April 14 to May 3, 2017, after an April 14 2017, recorded in-person meeting where CS3 showed Calloway a photo of the AK-47 on which Calloway had made a down payment (A222-227); (9) in phone and internet conversations with W4 in October and November 2016, in which Calloway asked W4 to bring him a pistol (A227); and (10) in post-arrest statements heard by W7, who had been jailed with Calloway while his case was pending (A227-228).

For example, in addition to the statements cited supra at pp. 4-12 and n.5, in a July 2014 Facebook post, Calloway stated that he supported ISIS leader Abu Bakr al-Baghdadi and the ISIS caliphate, and stated in a December 31, 2014, post that the Marines had taught him how to make

explosives (A207). On October 29, 2016, Calloway emphasized his desire to commit a race war against whites, stating, "Let's put bullets in them" (A208).

In a September 30, 2016, Facebook text with CS1, Calloway stated that he was an ex-convict and Marine veteran (A210). Calloway stated that while he was in federal prison in 2008-2009, he met the mastermind of the "Fort Dix 6" murder conspiracy, described him as his friend, stated his belief that they had met for a reason, and then stated, "We are all Mujahideen" (A210).[10] Calloway said, "I'm going to kill some of these crackers before the death angel approaches," and "[t]he battlefield will be here shortly" (A211).

On March 31, 2017, CS3 and Calloway watched a documentary about ISIS, which showed a man demonstrating how to operate an AK-47 (A214). Calloway told CS3 that he wanted an AK-47 (A214). That day, Calloway posted statements on Facebook including, "I just had a good visit with my Muslim neighbor. This is trouble for the nonbelievers."

---

[10] "Mujahadeen" is a person engaged in jihad, i.e., holy war (A34, A210). Calloway was incarcerated with one of the defendants convicted in 2007 of a conspiracy to murder military personnel at Fort Dix Military Base in New Jersey (A35-36).

(A218.) On April 1, 2017, Calloway posted on Facebook, "When this race war kicks off, we ain't just slaughtering the Neanderthal" (white people), and indicated that black people he considered disloyal would also be executed "with an AK-47!" (A105 & n.5, A219). That day he also posted, "I have always been popular, and loved, yet I just want to kill with impunity," and, in another post, stated that his weapons of choice included "Machete" and "AK-47" (A219).

On April 14, 2017, after Calloway met with CS3, who showed him a photo of the AK-47 on which Calloway had made a down payment, Calloway made numerous posts, which included statements such as, "Warning, war is imminent! I have prepared all my life for this!"; "When this war comes, I'm going on a killing/cannibal spree!"; and "Ak in route! Machete on deck! I'm slaughtering anybody that ain't Muslim in these last days" (A222). On April 20, 2017, Calloway posted "Soon the great killing will commence" (A224). On April 30, 2017, Calloway posted, "Just as in the United States Marine Corps, I command a small unit of warriors. I won't give out a number. Just know that they await my orders to strike at the devil, when Babylon least expects it." (A224.) That day, he also posted statements such as, "Ak-47! Remember this post," and "I'm

ready to slaughter these cave dwellers" (white people) (A105 n.5, A225).
On May 1, 2017, he posted, "We must separate from the white devils of
Babylon, and form our own nation under Islamic law" (A225). On May 3,
2017, the day before receiving the AK-47, Calloway posted statements
including, "Death to the European, fake, Jewish, imposters" and said, in
suggesting that someone should shoot a "cracker cop" who had killed a
black man in Texas, "It's time that we start killing them" (A226). That
day, he further posted, "Brothers is shooting these cops back. Good. These
cops still killing us, so, by all means shoot back." (A227.)

The government also highlighted Calloway's attempt to obtain a
pistol from W4 in the fall of 2016, and his post-arrest statements while
jailed with W7 voicing approval for harming police officers, and his desire
to do so (A227).

In Calloway's November 12, 2019, response, counsel did not dispute
the accuracy of Calloway's Facebook posts or his recorded statements
(A230). Nor did Calloway dispute the content of his conversation with W4
(A230). Counsel complained, however, that the government cherry-
picked "the damaging statements" Calloway made during conversations

22

that had included other topics (A230). Calloway disputed the accuracy of statements attributed to him by W7 (A230).

## *W7's Testimony*

At a May 17, 2021, hearing before Judge Leon, W7 testified that he was jailed with Calloway for about six months in the Central Treatment Facility (CTF) (A433-435). While watching television together, Calloway said that he was jailed because "this bitch motherf***er set me up" and bought "the machine guns," and that he was going to kill that person (A434-439). Calloway said he would beat the charges in his case (A444). When there were television-news reports of ISIS attacks, or of police being ambushed, Calloway would "celebrate" like a fan "jumping up" when the "Redskins make a touchdown" (A435-436, A440-441).

W7 testified that Calloway was also an admitted racist who said he "can't stand whites" (A442). Calloway talked about a race war and said that he was "trying to get enough machine guns" (A442-443). Calloway said that "the police made a mistake by grabbing him so fast" because had he not been arrested, he would have bought a lot more machine guns to attack white people and white police officers (A443). Calloway said he would shoot any black officers who were with the white officers (A443-

444). Calloway indicated that the police were incorrect about an aspect of his case: he was not going to ambush the First District police station, but rather another station (A445).

W7 testified that Calloway also indicated that his military training would enable him to ambush people (A438). Calloway said that when he got out of jail, he would leave the United States and train ISIS (A446).

Thereafter, in its fifth supplemental sentencing memorandum, the government asserted that W7's testimony showed that Calloway remained dangerous because he still harbored a strong desire to support ISIS, to obtain more illegal machine guns and, upon release, to use his military background to kill those who caused his arrest, the police, white people, and enemies of ISIS (A266-267). And Calloway had wanted to attack a different police station than the First District (A266-267).

At a June 16, 2021, hearing, Judge Leon announced that he credited W7's testimony (A504). Calloway accepted the court's findings (A523).

### The District Court's July 27, 2021, Memorandum Opinion

The district court found that Calloway "had a lengthy history of making highly inflammatory statements on social media," and adopted paragraphs 6-20 and 23-29 of the PSR, which outlined the investigation,

Calloway's offenses, and his post-arrest statements to law enforcement (A283 & n.1). Citing the PSR, the court found that on public accounts, Calloway pledged support to ISIS and "friended" several hundred ISIS fighters and sympathizers (A284). Calloway also "expressed support for violent actions," ranging from sharing "pictures associated with jihad and terrorism" to "more sinister statements, such as urging others to engage in mass violence against racial groups and police officers" (A284).

The court briefly recounted Calloway's communications with CS2 and CS3 about weapons, including that Calloway accepted CS3's offer to sell him an AK-47, and he "even agreed to pay an extra $50 to receive a fully automatic AK-47" (A284-285). The court found that while awaiting delivery of the AK-47, Calloway continued to make menacing statements (A285). For example, he told CS3 that he wanted to use the AK-47 on "crackers" (A285). On social media, he wrote such things as "Ak-47! Remember this post," "[n]ever underestimate a Marine corps veteran," that he was "ready to slaughter these cave dwellers," and "Death to the European, fake, Jewish, imposters" (A285). The court found that on May 4, 2017, "FBI agents delivered to Calloway a disabled fully automatic AK-

47 and ammunition," and that "Calloway was arrested and confessed shortly thereafter" (A285).

The court also found that after his arrest, Calloway "continued his pattern of menacing statements" (A285). For example, after initially saying he wanted the gun for "protection," he told government agents that he needed it for a "race war" (A285). Relying on W7's testimony, the court found that Calloway told other inmates that he planned to kill the agents responsible for his arrest and he "continued to express support for violent terrorist attacks" (A285).

The court found that Calloway's plea-colloquy admissions, standing alone, warranted the § 2K2.1(b)(6)(B) enhancement (A289). Calloway had pleaded guilty to the indictment, which alleged that he had "an intent to commit an offense [with the firearm] punishable by imprisonment for a term exceeding one year," and that he had "knowledge and reasonable cause to believe that an offense punishable by a term of imprisonment exceeding one year was to be committed [with the firearm]," specifically ADW (A288 (quoting indictment (A56-57)). In his plea colloquy, Calloway admitted to having the intent the indictment alleged and acknowledged that he was pleading guilty because he was guilty (A288-289).

26

Additionally, the court found that Calloway's "menacing statements" supported the enhancement (A289-290). The court found particularly probative Calloway's statements from March 31 to May 4, 2017, "between his decision to purchase the AK-47 and his acquisition of the gun" (A289). As examples, the court cited Calloway's social-media posts which included the statements, "Ak in route! Machete on deck! I'm slaughtering anybody that ain't Muslim in these last days" (A289 (citing A222 ¶ 23.f.)); "Attention all military and combat veterans: Prepare for death" (A289 (citing A223 ¶ 23.i.)); "Soon the great killing will commence" (A289 (citing A224 ¶ 23.m.)); and, on the day before he received the AK-47, "These cops still killing us, so, by all means shoot back" (A289-290 (citing A227 ¶ 23.ii.).)[11]

The court rejected Calloway's claim that § 2K2.1(b)(6)(B) was inapplicable because the AK-47 was disabled and only briefly in his possession and thus could not have facilitated ADW (A.292 n.8). The

---

[11] The court rejected the Probation Office's position that the § 2K2.1(b)(6)(B) was inapplicable because Calloway had not taken any substantial steps toward committing another felony offense, and that the "other offense" referenced in § 2K2.1(b)(6)(B) could not be a "potential offense" (A290-291 & n.6).

court found that the term "facilitated, or had the potential of facilitating" in Application Note 14,[12] upon which Calloway relied, was adopted to clarify the first clause of § 2K2.1(b)(6)(B), addressing whether the defendant "used or possessed any firearm or ammunition in connection with another felony offense" (A292 n.8). At issue here, however, was the subsequent clause, addressing whether Calloway "possessed . . . any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense" (A292 n.8).[13]

Regarding the government's upward-departure requests under §§ 5K2.6, 5K2.9, and 5K2.14, the court recognized that under *Koon v. United States,* 518 U.S. 81, 95-96 (1996), it was required to determine whether the case fell outside the guidelines' heartland as a "special, or unusual, case," and if so, whether it was authorized to depart because "the applicable Guideline d[id] not already take [these special or unusual factors] into account" (A292). The court also recognized that "even where

---

[12] In an apparent typographical error, the court's decision cited Application Note 4. Application Note 14 pertains to § 2K2.1(b)(6)(B).

[13] The court also rejected Calloway's claim that applying § 2K2.1(b)(6)(B) would violate the First Amendment (A291 n.8).

'the basis for [a] departure is taken into consideration in determining the guideline range,' a departure may still be warranted 'in an exceptional case' that involves aggravating or mitigating factors far beyond those 'ordinarily involved' in the offense contemplated by the Guidelines" (A293 (quoting U.S.S.G. § 5K2.0(a)(3)).

The court found that it could depart upward under § 5K2.14 "to reflect the nature and circumstances of the offense" "[i]f national security, public health, or safety was significantly endangered" (A295 (quoting U.S.S.G. § 5K2.14).) The court found this departure appropriate because "Calloway intended to use a fully automatic AK-47 with a high-capacity magazine to commit [ADW]" and "[h]e also possessed a machete that he indicated could play a role in this attack," citing Calloway's April 14, 2017, social-media post that stated, "Ak in route! Machete on deck!" (A296 (quoting A222 ¶ 23.f.)). The court found that Calloway's "dangerous nature . . . at the time of the offense—being armed with multiple weapons that he intended to use in carrying out an attack—created a serious risk that multiple individuals could have been killed or injured" (A296). Thus, the court concluded that "this situation presented a serious threat to public safety that takes this case outside of the

Guidelines' heartland," citing U.S.S.G. § 2K2.1 cmt. n.11(D), which provides that "[a]n upward departure may be warranted" where "the offense posed a substantial risk of death or bodily injury to multiple individuals" (A296).[14] The court found that the guidelines did not adequately account for that risk, explaining that although the § 2K2.1(b)(6) enhancement "accounts for Calloway's intent to commit *a felony*, it does not consider the serious risk stemming from the particular felony Calloway intended to commit in this case" (A296 (citing *United States v. Singer,* 825 F.3d 1151, 1158 (10th Cir. 2016) (emphasis in original)). Thus, the court concluded, "two additional points [we]re warranted to reflect the serious danger to public safety" (A296).

The court recognized that a § 5K2.14 departure applied only if the "conduct endangered public welfare *at the time of the act*" (A296 (citing A174 (emphasis in original))). The court stated that § 5K2.14 was "written in the past tense—*i.e.,* 'was significantly endangered'"—thus

---

[14] Calloway is misguided insofar as he suggests (at 23 n.17) that the court misunderstood the applicability of § 2K2.1 Application Note 11(D) because it cross-references Application Note 7, pertaining to destructive devices. Application Note 11(D) does not state that a departure is permitted only if the offense involved a destructive device.

suggesting that a defendant's future dangerousness should not be considered (A297 (citing *United States v. Moses,* 106 F.3d 1273, 1278 (6th Cir. 1997))). The court specifically found that "Calloway was dangerous at the time of the offense, when he was armed and had the intent to commit [ADW]" (A297).

The court rejected Calloway's argument that he was not a danger because he only briefly possessed the AK-47 (A297). Instead, Calloway got "the facts backwards," as he was quickly arrested "*because* he presented a danger to public safety" (A297 n.10 (emphasis in original)).

The court denied the § 5K2.6 departure request, which it was authorized to grant "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense" (A297). The court noted that the extent of a sentencing increase under § 5K2.6 "ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others" (A297). It found that although Calloway possessed a dangerous weapon – a fully automatic AK-47 – during the commission of the offense, the base offense level under § 2K2.1(a)(3)(A)(ii) already accounted for his possession of a

31

machine gun (A297-298). Also, Calloway had not "used" the AK-47 "in the commission of the offense" (A298).

The court rejected the government's argument that § 5K2.6 should apply because Calloway possessed the machine gun with a large-capacity magazine, and a machete, with intent to commit "mass murder of law enforcement officers by ambush," thus demonstrating that his "possession of the weapon carried with it a substantial risk of death" (A297-298). It found that the intent to commit such an attack was accounted for under the § 2K2.1(b)(6)(B) enhancement and the § 5K2.14 departure, and the government had not explained "how the intent to commit a *future* crime constitute[d] use or possession '*in the commission of the offense*'" (A298 (emphasis in original)). The court noted that mere possession of the large-capacity magazine and machete during the offense was not so extraordinary as to justify a departure and the dangerousness of those items, along with the firearm, was already covered by § 5K2.14 (A298 n.11).

The court denied the § 5K2.9 departure request, which it was authorized to grant "to reflect the actual seriousness of the defendant's conduct" "[i]f the defendant committed the offense in order to facilitate or

conceal the commission of another offense" (A287, A293). It found that § 2K2.1(b)(6)(B) already accounted for Calloway's intent to commit another felony offense (A293-295).

The court adopted the PSR's uncontested base offense level of 19, after subtracting three levels for acceptance of responsibility (A299). It found that Calloway's total offense level was 25, after applying the four-level § 2K2.l(b)(6)(B) enhancement and the two-level § 5K2.14 departure (A299). Applying Calloway's criminal history category III, it calculated the guidelines range as 70-87 months (A299).

### The Sentencing Hearing

At the sentencing hearing, the government sought an upward variance under § 3553(a) to 120 months' imprisonment to deter criminal conduct (A537, A551-552). It asserted that sentence was appropriate because Calloway intended to commit mass murder, noting that he had communicated a pro-ISIS, anti-white, and anti-law-enforcement ideology, and, while jailed, had confirmed to W7 that he had intended to assault the police (A538). W7's testimony also showed that Calloway still held his radical beliefs and posed a serious danger to the community (A551). The government noted that Calloway had approximately 5,000

Facebook followers and thus had communicated his ideas to many people, and his statements showed that, even independently, he wanted to kill people (A542-543, A545). Also, Calloway had a history of violence and had said that he would use his military training to harm others (A540).

Defense counsel sought a downward variance to time served (48 months) (A560, A564, A568). Counsel acknowledged, that Calloway had been making offensive, threatening statements since 2014, but claimed that the evidence suggested a lack of urgency or motivation on Calloway's part to attack others (A553, A557). Counsel asserted that Calloway should receive a downward variance for his military service, his mental-health history, and his jail time during the pandemic (A558, A560, A563).

Calloway addressed the court, renouncing ISIS and claiming that his prior support was "support of an idea" more than of ISIS's "undertakings" (A564). He asserted that, nonetheless, he would not pretend to accept racism and police killings of black people (A564-565). He claimed that he was merely guilty of firearm possession as a convicted felon and never intended to use the firearm to harm anyone (A565).

In imposing sentence, the court recognized that Calloway could not use the AK-47 because agents had disabled it (A567). The court noted

that, nonetheless, Calloway used the Internet for a sustained period to make extremely inflammatory, aggressive, and violent statements that could have influenced his social-media followers to "rally to [his] cause," and that deterring people from doing so was a "principally important factor" in determining the appropriate sentence (A567).

The court denied the parties' variance requests because both would cause an unjust result (A567-568). The court imposed concurrent 84-month terms of imprisonment, explaining that it would help to protect the community, which was the court's overarching concern, and would give Calloway time to consider his positions more carefully and whether he was "inclined to do the kinds of things" he had stated on social media (A568, A570-571).

## SUMMARY OF ARGUMENT

The district court appropriately applied a two-level upward departure under U.S.S.G. § 5K2.14. The departure reflected the significant endangerment to public safety posed by Calloway's offenses, given that he was a trained former Marine and ISIS supporter who had purchased an AK-47 with long-stated plans to attack people he viewed as his ideological enemies. The fact that the AK-47 he purchased had been

35

disabled did not make the application of § 5K2.14 improper. And the concerns of § 5K2.14 were not already accounted for under § 2K2.1(a)(3)(A)(ii), which provided the base offense level for the involvement of a machine gun, or under § 2K2.1(b)(6)(B), which provided a four-level enhancement for Calloway's possession of a firearm in connection with another felony offense.

## ARGUMENT

## The District Court Did Not Err in Departing Upward Pursuant to U.S.S.G. § 5K2.14.

### A.     Standard of Review and Legal Principles

Generally, this Court reviews a defendant's sentence for abuse of discretion, proceeding in two steps. *Gall v. United States,* 552 U.S. 38, 51 (2007). During the first step – the only one at issue here – this Court verifies that the district court "committed no significant procedural error." *Id.* Procedural errors include, for example, improperly calculating the sentencing-guidelines range, "selecting a sentence based on clearly erroneous facts," *id.,* or basing the sentence on an "incorrect legal interpretation" of the guidelines. *United States v. Brevard,* 18 F.4th 722, 726 (D.C. Cir. 2021). In "reviewing a sentencing decision," this Court

evaluates "purely legal questions de novo, accept[s] the district court's factual findings unless they are clearly erroneous," and gives "due deference" to the district court's application of the guidelines to the facts. *United States v. Saani,* 650 F.3d 761, 765 (D.C. Cir. 2011). This Court reviews de novo the district court's interpretation of the sentencing guidelines in calculating a defendant's guidelines range. *United States v. (Dawayne) Brown,* 892 F.3d 385, 401 (D.C. Cir. 2018).

A district court is authorized to depart from a defendant's guidelines range, as permitted by certain guidelines rules. *Chavez-Meza v. United States,* 138 S. Ct. 1959, 1963 (2018). Under U.S.S.G. § 5K2.0(a)(1)(A), for most offense types, the court may depart if it "finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance" "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." Chapter 5, Part K, Subpart 2 (Other Grounds for Departure), identifies "some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable

guideline range (*e.g.,* as a specific offense characteristic or other adjustment)." U.S.S.G. § 5K2.0(a)(2)(A).

One of those "identified circumstances" appears in U.S.S.G. § 5K2.14, under which the district court may depart upward from the guidelines range "to reflect the nature and circumstances of the offense" "[i]f national security, public health, or safety was significantly endangered." "Danger to the public's safety is a factor upon which the Sentencing Commission has encouraged departure." *United States v. Terry,* 142 F.3d 702, 706 (4th Cir. 1998). Thus, this Court "must determine whether the conduct that created the danger is taken into account by the [applicable guideline for the underlying offense]." *Id.*

If a factor is one upon which the Sentencing Commission encourages departure, and that factor is not accounted for by the applicable guideline, a court may exercise its discretion and depart on that basis. *See Koon,* 518 U.S. at 96. Where an encouraged factor is already accounted for in the applicable guideline, a court "should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.*; *see also* U.S.S.G. § 5K2.0(a)(3).

## B.    Discussion

### 1.    The Court Properly Found That Public Safety Was Significantly Endangered.

The district court did not abuse its discretion by applying a § 5K2.14 departure. As the district court appropriately found, Calloway significantly endangered public safety (A295-296).

First, contrary to Calloway's claim (at 27-28, 30-31), the court did not misinterpret § 5K2.14 by applying it even though the AK-47 had been disabled before being given to him. At least one other court has affirmed a § 5K2.14 departure where the government's undercover role relating to a defendant's commission of the offense would apparently have thwarted potential danger arising from that offense. *See, e.g., United States v. Roth,* 934 F.2d 248, 250-52 (10th Cir. 1991) (§ 5K2.14 departure warranted where district court found defendant's sale of stolen military equipment over course of two years to "Military Surplus Brokers," an FBI-established undercover business, could have endangered national security; remanding for further explanation of reasons for degree of departure). Although it does not appear that this specific issue was before the court in *Roth*, the government's role as recipient of items the

39

defendant transferred mitigated the danger that those items would end up in the wrong hands. Additionally, as discussed infra at p. 42 n.16, in applying § 5K2.14, the district court appropriately found that Calloway also possessed a machete at the time of the offense, which he intended to use in committing ADW (A296). Thus, the court did not rely solely on the disabled AK-47 for the upward departure.

Second, Calloway claims (at 28, 31-33) that the court improperly applied § 5K2.14 because his purported intent to cause future harm "beyond the temporal scope of the government-controlled sting operation" could not significantly endanger public safety "at the time of his offense." This claim also lacks merit.

To begin with, although Calloway casts his argument in terms of his "purported intent," as the district court correctly recognized, in pleading guilty to the § 924(b) offense, Calloway admitted that he had the intent to commit ADW (A288-290). Furthermore, although Calloway acknowledges (at 33) that the district court found he "was dangerous at the time of the offense," he attempts to distort that finding by asserting that despite this express language, the court was actually applying § 5K2.14 to potential future conduct. The court, however, recognized that

§ 5K2.14 was "written in the past tense," which "suggest[ed] that the [c]ourt should not consider the 'future dangerousness of the defendant,'" citing *Moses,* 106 F.3d at 1278 (A297). The court also highlighted Calloway's present dangerousness in rejecting his argument that he could not be dangerous because he was immediately arrested upon obtaining the AK-47 (A297 n.10). The court permissibly found that Calloway's argument "gets the facts backwards," for he "was arrested after only briefly possessing an unlawful weapon *because* he presented a danger to public safety" (A297 n.10 (emphasis in original)).

Moreover, Calloway too narrowly cabins the "time of the offense" to the final encounter in which CS3 gave him the AK-47. The plain language of § 5K2.14 permits an upward departure if "public health, or safety was significantly endangered" "to reflect the *nature and circumstances of the offense*" (emphasis added).[15] Count 1 of the indictment charged Calloway with interstate transportation of a firearm and ammunition under 18 U.S.C. § 924(b) and 18 U.S.C. § 2 (causing an act to be done) (A57), and

---

[15] As defined in the commentary to § 5K2.0, the term "'[c]ircumstance' includes, as appropriate, an offender characteristic or any other offense factor. U.S.S.G. § 5K2.0, Application Note 1.

thus the district court, at the very least, could appropriately consider as part of the offense Calloway's statements and actions while he was causing the AK-47 to be transferred across state lines by negotiating and paying CS3 for it. This included his highly menacing statements and his possession of a machete, which defense counsel conceded was "always" in his apartment (A554).[16]

Indeed, additional evidence even beyond this period could be appropriately considered in assessing Calloway's dangerousness, including his prior menacing statements and attempts to obtain guns from W4 and CS2, and his statements to W7 which reflect that he had

---

[16] The district court's statement that Calloway was "armed with multiple weapons that he intended to use in carrying out an attack," referring to both the AK-47 and his machete (A296), does not represent a clear factual error in applying § 5K2.14. The court's surrounding statements showed that the court understood that Calloway "possessed a machete that he indicated could play a role in [the ADW]" (A296). Such possession was confirmed by agents finding a machete in Calloway's apartment after his arrest in CS3's apartment (PSR ¶ 19), and the concession by Calloway's counsel (A554). The district court recognized earlier in its memorandum opinion that Calloway's intent to commit ADW was shown in his menacing statements after deciding to buy the AK-47 from CS3, including his April 14, 2017, Facebook statement, "Ak in route! Machete on deck! I'm slaughtering anybody that ain't Muslim in these last days" (A289). Because intent to commit ADW was an element of the § 924(b) charge, Calloway is incorrect insofar as he claims (at 31 n.20) that the machete possession was not part of his offense.

planned to attack police officers (A443-445). Other courts have considered facts beyond those involved in the immediate events of the charged crime in properly applying a § 5K2.14 departure. *See, e.g., United States v. Nelson,* 296 F. App'x 475, 477-78 (6th Cir. Oct. 10, 2008) (affirming § 5K2.14 departure for defendant convicted of one count of making false statement in acquiring firearm where district court considered, inter alia, that although charged offense was completed with purchase of one firearm, defendant committed crimes by selling over 200 guns to persons, including known felons, and people were injured with some of those guns); *United States v. Ferguson,* 73 F. App'x 79, 2003 WL 21756639, at **2-5 (5th Cir. June 24, 2003) (affirming § 5K2.14 departure for defendant convicted of five counts of selling firearms to prohibited person, where court considered that ATF contacted defendant approximately 124 times after guns he sold were recovered at crime scenes, and ATF statistics indicated defendant was involved in firearm-trafficking schemes with others); *United States v. (Cary) Brown,* 9 F.3d 907, 912-13 (11th Cir. 1993) (court may consider defendant's criminal history in applying § 5K2.14 departure; court could reasonably conclude handgun-possession offense by long-time criminal like defendant posed

threat to public safety); *United States v. Todd,* 909 F.2d 935, 398 & n.6 (9th Cir. 1990) (upholding § 5K2.14 departure where defendant's theft of blank military identification cards posed potential danger of misuse which "could significantly endanger national security"; remanding for explanation of extent of departure); *United States v. Joan,* 883 F.2d 491, 495-96 (6th Cir. 1989) (§ 5K2.14 departure justified based on defendant's prior probation-violation history and continuing violence against victims, which showed defendant fit career-recidivist profile and would continue to pose serious threat to safety of "whatever community he is in," where defendant pled guilty to drug-trafficking and firearm charges); *see also United States v. Vargas,* 73 F. App'x 746, 746 (5th Cir. 2003) (no plain error in departing based, in part, on § 5K2.14, where defendant convicted of issuing over 2,700 false social-security cards to illegal aliens, and court found providing cards to aliens from terrorism-supporting countries placed nation in great peril).

Notably, some cases indicate that in applying § 5K2.14, it is appropriate for a sentencing court to consider potential endangerment, and evidence occurring after the offense on which the defendant is being sentenced. *See, e.g., Nelson,* 296 F. App'x at 478 (although charged

44

offense was completed with purchase of one firearm, defendant "continued committing crimes" when he sold guns to others); *Roth,* 934 F.2d at 251 (defendant's sale of stolen military equipment "could have endangered national security"); *Todd,* 909 F.2d at 398 (defendant's theft of blank military identification cards posed "potential threat to national security"). Indeed, *Moses's* prohibition on considering the "future dangerousness of the defendant" did not arise from a temporal analysis of the offense for which the defendant was being sentenced. Instead, *Moses* addressed an evidence-based concern that if released on the day of sentencing, the defendant would likely discontinue taking his anti-psychotic medication and consequently become dangerous. *Id.* at 1278 & n.4. It was against that background that the *Moses* court held that § 5K2.14 "requires a court to look at the offense committed and the dangerousness of the defendant *at the time of the crime,* not the future dangerousness of the defendant," and found legal error in applying § 5K2.14 due to concern about the defendant's future mental health. *Id.* (emphasis in original). That scenario stands in stark contrast to this case, where the district court assessed the facts and found "that Calloway was dangerous at the time of the offense, when he was armed and had the

45

intent to commit [ADW]" with "a fully automatic AK-47 with a high-capacity magazine" (A296, A297).

Additionally, Calloway is incorrect in claiming (at 33-34) that the district court's denial of a § 5K2.6 departure revealed that the court relied on Calloway's "potential future endangerment" in applying § 5K2.14. The court primarily denied the § 5K2.6 departure because Calloway's possession of the AK-47 in the commission of the offense was accounted for in the base offense level for machine gun possession, and he did not use the AK-47 in committing the gun offenses for which he was being sentenced (A297-298).[17] Secondarily, the court rejected the government's argument for applying § 5K2.6, i.e., that Calloway possessed a machine gun with a large capacity magazine with intent to "commit mass murder of law enforcement officers by ambush" and thus the "possession of the weapon carried with it a substantial risk of death" (A120). The court declined to apply § 5K2.6 on those grounds because "(1) intent to commit an attack (2) that would endanger the public" was

---

[17] Section 5K2.6 authorizes an upward departure "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."

already accounted for by the § 2K2.1(b)(6)(B) enhancement and § 5K2.14 departure, respectively (A298). Further, the court found that the government had "fail[ed] to explain how the intent to commit a *future* crime constitutes use or possession '*in the commission of the offense*'" (A298 (quoting § 5K2.6) (emphasis in original)). Contrary to Calloway's claim, this final sentence merely reflects that the court did not believe § 5K2.6 allowed it to find that Calloway's current intent to commit an ADW in the future fell within "the commission of" the weapons offenses for which he was being sentenced. It was not a tacit admission that the court had committed legal error by misconstruing the bounds of § 5K2.14.

## 2.     Applying the § 5K2.14 Departure Was Not Impermissible Double Counting.

Calloway claims that the district court erred in applying the § 5K2.14 departure because it constituted impermissible double counting. This claim lacks merit.

Impermissible double counting "occurs where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United States v. Reese,* 2 F.3d 870, 895 (9th Cir. 1993). However, "[w]hen more than one kind of

47

harm is attributable to a given aspect of a defendant's conduct, failure to enhance his punishment for each harm caused thereby would defeat the Commission's goal of proportionality in sentencing." *Id.* "Thus, there is nothing wrong with 'double counting' when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." *Id.*

The district court correctly rejected a double-counting argument in applying the § 5K2.14 departure, in finding that the guidelines did not adequately account for the serious threat to public safety Calloway posed (A296). The court accurately stated that the § 2K2.1(b)(6)(B) enhancement "account[ed] for Calloway's intent to commit *a felony,*" but it did not consider the serious risk stemming from ADW, which was the offense Calloway had intended to commit (A296). Indeed, § 2K2.1(b)(6)(B) applies a four-level increase the base offense level "[i]f the defendant possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." That guideline provision is not specific to ADW.

Nor, contrary to Calloway's claim (at 36-37), did § 2K2.1(a)(3)(A)(ii) – the base offense level for involvement of a machine gun – account for the significant public endangerment reflected in his offenses. The plain language of § 2K2.1(a)(3)(A)(ii) reflects that it is applicable any time a machine gun is "involved" in the offenses being sentenced. It is designed to account for the dangerousness of the weapon itself. Furthermore, Application Note 11 of § 2K2.1 states that an upward departure may be warranted in certain circumstances, including where "the offense posed a substantial risk of death or bodily injury to multiple individuals." This Application Note therefore reflects that setting the base offense level under § 2K2.1(a)(3)(A)(ii) due to the involvement of a machine gun does not take into account the same considerations as the guidelines' upward-departure provisions.

Indeed, a § 5K2.14 departure is designed to account for more than the inherent dangerousness of a particular weapon or an intent to possess or use that weapon in connection with another felony. For instance, a defendant's illegal possession of a machine gun with intent to commit another felony might, or might not, involve an intent to harm someone. And, even such an intent to harm could target a single person rather than

create significant endangerment to national security, or public health or safety. Here, the district court properly applied the § 5K2.14 departure, which it recognized took into account Calloway's intent to commit ADW that created "a serious risk that multiple individuals could have been killed or injured," that was inadequately accounted for by the guidelines (A296).[18] Thus, the court properly used this additional aspect of the evidence to upwardly depart under § 5K2.14. *See, e.g., United States v. Reis,* 369 F.3d 143, 151 (2d Cir. 2004) (court did not impermissibly double

---

[18] Contrary to Calloway's suggestion (at 36-37), the district court's finding in its July 27, 2021, decision that he intended to commit ADW, sufficiently reflected that the ADW targeted many members of the public. In applying the § 5K2.14 departure, the court referred to its ruling on the § 2K2.1(b)(6)(B) enhancement (A296 – "As I concluded above"), which cited Calloway's statements after deciding to buy the AK-47 displaying his intent to kill non-Muslims, military veterans, and police officers (A289-290). The fact that in response to a government sentencing-hearing argument seeking an upward variance under 18 U.S.C. § 3553, the district court noted that it had not concluded in its July 27 decision that Calloway was "trying to commit an act of mass murder in the District of Columbia" (A537-539) does not demonstrate that the § 5K2.14 departure was improperly applied here. The court merely pointed out that the "mass murder" statement was the government's "advocacy gloss," and the government then asserted that making a specific "mass murder" finding was unnecessary because many of Calloway's statements showed his intent (A539).

Also, contrary to Calloway's argument (at 35-36), as explained supra at p. 42 n.16, the court's statement indicating that Calloway was armed with the AK-47 and his machete (A296) was not clear factual error.

count victim's age in departing from guidelines range, where Sentencing Commission explicitly considered victim age in establishing statutory-rape offense level, and where court considered age in departing insofar as victim's young age, and thus her implied vulnerabilities, made risk of her death more foreseeable).

Calloway's reliance on *United States v. Uca,* 867 F.3d 783 (3d Cir. 1989) does not undermine the application of § 5K2.14 here. In *Uca,* the district court sentenced two codefendants who pleaded guilty to conspiracy to commit federal firearms offenses for attempting to buy 56 guns that were to be delivered to another state and ultimately shipped overseas. *Id.* at 785. The court upwardly departed from the codefendants' guidelines ranges because their possession of 56 handguns posed a serious threat to public safety and community welfare. *Id.* at 786. The district court based its departure on the large number of guns, their non-traceability, and their potential to be used for some illegal but undefined purpose, including potential violence in this country or another. *Id.* The Third Circuit, however, found those stated reasons for departure were all contemplated within the relevant offense guideline, former § 2K2.3. *Id.* at 787-90. The Third Circuit rejected the government's assertion that the

departure was justified pursuant to § 5K2.14.[19] It found that because the applicable guidelines "clearly contemplated the very activities charged in these [codefendants'] cases, the departure was not lawful." *Id.*

Calloway emphasizes the *Uca* court's statement that public safety is a prime consideration whenever restrictions are placed on guns, which is reflected in the fact that Chapter 2, Part K of the guidelines, which includes provisions governing firearms violations, is entitled "Offenses Involving Public Safety." 867 F.3d at 790. However, neither *Uca,* nor the firearms guidelines, state that a § 5K2.14 departure cannot apply to firearms offenses. As noted supra at p. 49, Application Note 11 of § 2K2.1 states that an upward departure may be warranted in certain circumstances, including where "the offense posed a substantial risk of death or bodily injury to multiple individuals." Indeed, other courts have upheld § 5K2.14 departures in firearms-possession cases. *See, e.g., United States v. McNeal,* 951 F.2d 364 (9th Cir. 1991) (affirming § 5K2.14 departure where defendant convicted of possessing firearms in violation of 18 U.S.C. § 922(g)(1) sold guns to known felons and gang members).

---

[19] The government had not sought an upward departure in the district court. *Uca,* 867 F.2d at 785.

And, as shown supra, unlike the facts the sentencing court relied upon to upwardly depart in *Uca,* the factors relevant to the § 5K2.14 departure here were not already accounted for in other guidelines provisions.

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
>
> CHRISELLEN R. KOLB
> JOHN P. MANNARINO
> TEJPAL S. CHAWLA
> Assistant United States Attorneys
>
> _____/s/_____
> KATHERINE M. KELLY
> D.C. Bar #447112
> Assistant United States Attorney
> 601 D Street, NW, Room 6.232
> Washington, D.C. 20530
> (202) 252-6829

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains 10,889 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____
KATHERINE M. KELLY
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief and Addendum for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Rosanna M. Taormina, Assistant Federal Public Defender, 625 Indiana Avenue, NW, Washington, DC, on this 20th day of July, 2023.

/s/
_____
KATHERINE M. KELLY
Assistant United States Attorney

# ADDENDUM

# ADDENDUM

## INDEX

18 U.S.C. § 2 ............................................................................. A-1

U.S.S.G. § 2K2.1 ...................................................................... A-2

U.S.S.G. § 5K2.0 ...................................................................... A-11

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 1. General Provisions (Refs & Annos)

18 U.S.C.A. § 2

§ 2. Principals

Currentness

**(a)** Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

**(b)** Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 684; Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717.)

18 U.S.C.A. § 2, 18 USCA § 2
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

A-1

§2K1.7

**Commentary**

**Statutory Provisions:** 18 U.S.C. § 842(f), (g).

**Background:** The above-referenced provisions are recordkeeping offenses applicable only to *"licensees,"* who are defined at 18 U.S.C. § 841(m).

| Historical Note | Effective November 1, 1991 (amendment 373). A former §2K1.6 (Shipping, Transporting, or Receiving Explosives with Felonious Intent or Knowledge; Using or Carrying Explosives in Certain Crimes), effective November 1, 1987, amended effective November 1, 1989 (amendment 303) and November 1, 1990 (amendment 331), was deleted by consolidation with §2K1.3 effective November 1, 1991 (amendment 373). |
|---|---|

## §2K1.7. [Deleted]

| Historical Note | Section 2K1.7 (Use of Fire or Explosives to Commit a Federal Felony), effective November 1, 1989 (amendment 188), amended effective November 1, 1990 (amendment 332), was deleted by consolidation with §2K2.4 effective November 1, 1993 (amendment 481). |
|---|---|

\* \* \* \* \*

## 2. FIREARMS

### §2K2.1. Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition

(a)   Base Offense Level (Apply the Greatest):

   (1)   **26**, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

   (2)   **24**, if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

   (3)   **22**, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense;

A-2

    (4)  **20**, if—

        (A)  the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense; or

        (B)  the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) firearm that is described in 26 U.S.C. § 5845(a); and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense; (II) is convicted under 18 U.S.C. § 922(d); or (III) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

    (5)  **18**, if the offense involved a firearm described in 26 U.S.C. § 5845(a);

    (6)  **14**, if the defendant (A) was a prohibited person at the time the defendant committed the instant offense; (B) is convicted under 18 U.S.C. § 922(d); or (C) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

    (7)  **12**, except as provided below; or

    (8)  **6**, if the defendant is convicted under 18 U.S.C. § 922(c), (e), (f), (m), (s), (t), or (x)(1), or 18 U.S.C. § 1715.

(b)  **Specific Offense Characteristics**

    (1)  If the offense involved three or more firearms, increase as follows:

| | NUMBER OF FIREARMS | INCREASE IN LEVEL |
|---|---|---|
| (A) | 3–7 | add **2** |
| (B) | 8–24 | add **4** |
| (C) | 25–99 | add **6** |
| (D) | 100–199 | add **8** |
| (E) | 200 or more | add **10**. |

    (2)  If the defendant, other than a defendant subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5), possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition, decrease the offense level determined above to level **6**.

**A-3**

(3) If the offense involved—

   (A) a destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile, increase by **15** levels; or

   (B) a destructive device other than a destructive device referred to in subdivision (A), increase by **2** levels.

(4) If any firearm (A) was stolen, increase by **2** levels; or (B) had an altered or obliterated serial number, increase by **4** levels.

The cumulative offense level determined from the application of subsections (b)(1) through (b)(4) may not exceed level **29**, except if subsection (b)(3)(A) applies.

(5) If the defendant engaged in the trafficking of firearms, increase by **4** levels.

(6) If the defendant—

   (A) possessed any firearm or ammunition while leaving or attempting to leave the United States, or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States; or

   (B) used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense,

   increase by **4** levels. If the resulting offense level is less than level **18**, increase to level **18**.

(7) If a recordkeeping offense reflected an effort to conceal a substantive offense involving firearms or ammunition, increase to the offense level for the substantive offense.

(c) Cross Reference

(1) If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with

knowledge or intent that it would be used or possessed in connection with another offense, apply—

(A) §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above; or

(B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

### Commentary

**Statutory Provisions:** 18 U.S.C. §§ 922(a)–(p), (r)–(w), (x)(1), 924(a), (b), (e)–(i), (k)–(o), 1715, 2332g; 26 U.S.C. § 5861(a)–(l). For additional statutory provisions, *see* Appendix A (Statutory Index).

**Application Notes:**

1. **Definitions.**—For purposes of this guideline:

   "*Ammunition*" has the meaning given that term in 18 U.S.C. § 921(a)(17)(A).

   "*Controlled substance offense*" has the meaning given that term in §4B1.2(b) and Application Note 1 of the Commentary to §4B1.2 (Definitions of Terms Used in Section 4B1.1).

   "*Crime of violence*" has the meaning given that term in §4B1.2(a) and Application Note 1 of the Commentary to §4B1.2.

   "*Destructive device*" has the meaning given that term in 26 U.S.C. § 5845(f).

   "*Felony conviction*" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed. A conviction for an offense committed at age eighteen years or older is an adult conviction. A conviction for an offense committed prior to age eighteen years is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted (*e.g.*, a federal conviction for an offense committed prior to the defendant's eighteenth birthday is an adult conviction if the defendant was expressly proceeded against as an adult).

   "*Firearm*" has the meaning given that term in 18 U.S.C. § 921(a)(3).

2. **Semiautomatic Firearm That Is Capable of Accepting a Large Capacity Magazine.**—For purposes of subsections (a)(1), (a)(3), and (a)(4), a "*semiautomatic firearm that is capable of accepting a large capacity magazine*" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm. This definition does not include a semiautomatic firearm with an attached tubular device capable of operating only with .22 caliber rim fire ammunition.

3. **Definition of "Prohibited Person".**—For purposes of subsections (a)(4)(B) and (a)(6), "*prohibited person*" means any person described in 18 U.S.C. § 922(g) or § 922(n).

4. **Application of Subsection (a)(7).**—Subsection (a)(7) includes the interstate transportation or interstate distribution of firearms, which is frequently committed in violation of state, local, or other federal law restricting the possession of firearms, or for some other underlying unlawful purpose. In the unusual case in which it is established that neither avoidance of state, local, or other federal firearms law, nor any other underlying unlawful purpose was involved, a reduction in the base offense level to no lower than level 6 may be warranted to reflect the less serious nature of the violation.

5. **Application of Subsection (b)(1).**—For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer.

6. **Application of Subsection (b)(2).**—Under subsection (b)(2), "lawful sporting purposes or collection" as determined by the surrounding circumstances, provides for a reduction to an offense level of 6. Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (*e.g.*, prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law. Note that where the base offense level is determined under subsections (a)(1)–(a)(5), subsection (b)(2) is not applicable.

7. **Destructive Devices.**—A defendant whose offense involves a destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) (*e.g.*, subsection (a)(1), (a)(3), (a)(4)(B), or (a)(5)), and the applicable enhancement under subsection (b)(3). Such devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons.

Offenses involving such devices cover a wide range of offense conduct and involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported. For example, a pipe bomb in a populated train station creates a substantially greater risk to the public welfare, and a substantially greater risk of death or serious bodily injury, than an incendiary device in an isolated area. In a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created, an upward departure may be warranted. *See also* §§5K2.1 (Death), 5K2.2 (Physical Injury), and 5K2.14 (Public Welfare).

8. **Application of Subsection (b)(4).**—

(A) **Interaction with Subsection (a)(7).**—If the only offense to which §2K2.1 applies is 18 U.S.C. § 922(i), (j), or (u), or 18 U.S.C. § 924(l) or (m) (offenses involving a stolen firearm or stolen ammunition) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(A). This is because the base offense level takes into account that the firearm or ammunition was stolen. However, if the offense involved a firearm with an altered or obliterated serial number, apply subsection (b)(4)(B).

Similarly, if the offense to which §2K2.1 applies is 18 U.S.C. § 922(k) or 26 U.S.C. § 5861(g) or (h) (offenses involving an altered or obliterated serial number) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(B). This is because the base offense level takes into account that the firearm had an altered or obliterated serial number. However, it the offense involved a stolen firearm or stolen ammunition, apply subsection (b)(4)(A).

(B)   **Knowledge or Reason to Believe.**—Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number.

9.   **Application of Subsection (b)(7).**—Under subsection (b)(7), if a record-keeping offense was committed to conceal a substantive firearms or ammunition offense, the offense level is increased to the offense level for the substantive firearms or ammunition offense (*e.g.*, if the defendant falsifies a record to conceal the sale of a firearm to a prohibited person, the offense level is increased to the offense level applicable to the sale of a firearm to a prohibited person).

10.   **Prior Felony Convictions.**—For purposes of applying subsection (a)(1), (2), (3), or (4)(A), use only those felony convictions that receive criminal history points under §4A1.1(a), (b), or (c). In addition, for purposes of applying subsection (a)(1) and (a)(2), use only those felony convictions that are counted separately under §4A1.1(a), (b), or (c). *See* §4A1.2(a)(2).

   Prior felony conviction(s) resulting in an increased base offense level under subsection (a)(1), (a)(2), (a)(3), (a)(4)(A), (a)(4)(B), or (a)(6) are also counted for purposes of determining criminal history points pursuant to Chapter Four, Part A (Criminal History).

11.   **Upward Departure Provisions.**—An upward departure may be warranted in any of the following circumstances: (A) the number of firearms substantially exceeded 200; (B) the offense involved multiple National Firearms Act weapons (*e.g.*, machineguns, destructive devices), military type assault rifles, non-detectable ("plastic") firearms (defined at 18 U.S.C. § 922(p)); (C) the offense involved large quantities of armor-piercing ammunition (defined at 18 U.S.C. § 921(a)(17)(B)); or (D) the offense posed a substantial risk of death or bodily injury to multiple individuals (*see* Application Note 7).

12.   **Armed Career Criminal.**—A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an Armed Career Criminal. *See* §4B1.4.

13.   **Application of Subsection (b)(5).**—

   (A)   **In General.**—Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant—

      (i)    transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and

      (ii)   knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—

         (I)    whose possession or receipt of the firearm would be unlawful; or

         (II)   who intended to use or dispose of the firearm unlawfully.

   (B)   **Definitions.**—For purposes of this subsection:

      "*Individual whose possession or receipt of the firearm would be unlawful*" means an individual who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, impris-

**A-7**

onment, work release, or escape status. "Crime of violence" and "controlled substance offense" have the meaning given those terms in §4B1.2 (Definitions of Terms Used in Section 4B1.1). "Misdemeanor crime of domestic violence" has the meaning given that term in 18 U.S.C. § 921(a)(33)(A).

The term "*defendant*", consistent with §1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.

(C)  **Upward Departure Provision.**—If the defendant trafficked substantially more than 25 firearms, an upward departure may be warranted.

(D)  **Interaction with Other Subsections.**—In a case in which three or more firearms were both possessed and trafficked, apply both subsections (b)(1) and (b)(5). If the defendant used or transferred one of such firearms in connection with another felony offense (*i.e.*, an offense other than a firearms possession or trafficking offense) an enhancement under subsection (b)(6)(B) also would apply.

14.  **Application of Subsections (b)(6)(B) and (c)(1).**—

(A)  **In General.**—Subsections (b)(6)(B) and (c)(1) apply if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively. However, subsection (c)(1) contains the additional requirement that the firearm or ammunition be cited in the offense of conviction.

(B)  **Application When Other Offense is Burglary or Drug Offense.**—Subsections (b)(6)(B) and (c)(1) apply (i) in a case in which a defendant who, during the course of a burglary, finds and takes a firearm, even if the defendant did not engage in any other conduct with that firearm during the course of the burglary; and (ii) in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, application of subsections (b)(6)(B) and, if the firearm was cited in the offense of conviction, (c)(1) is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively.

(C)  **Definitions.**—

"*Another felony offense*", for purposes of subsection (b)(6)(B), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained.

"*Another offense*", for purposes of subsection (c)(1), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, regardless of whether a criminal charge was brought, or a conviction obtained.

(D)  **Upward Departure Provision.**—In a case in which the defendant used or possessed a firearm or explosive to facilitate another firearms or explosives offense (*e.g.*, the defendant used or possessed a firearm to protect the delivery of an unlawful shipment of explosives), an upward departure under §5K2.6 (Weapons and Dangerous Instrumentalities) may be warranted.

(E) **Relationship Between the Instant Offense and the Other Offense.**—In determining whether subsections (b)(6)(B) and (c)(1) apply, the court must consider the relationship between the instant offense and the other offense, consistent with relevant conduct principles. *See* §1B1.3(a)(1)–(4) and accompanying commentary.

In determining whether subsection (c)(1) applies, the court must also consider whether the firearm used in the other offense was a firearm cited in the offense of conviction.

For example:

(i) **Firearm Cited in the Offense of Conviction.** Defendant A's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant A used the shotgun in connection with a robbery. Ordinarily, under these circumstances, subsection (b)(6)(B) applies, and the cross reference in subsection (c)(1) also applies if it results in a greater offense level.

Ordinarily, the unlawful possession of the shotgun on February 10 will be "part of the same course of conduct or common scheme or plan" as the unlawful possession of the same shotgun on October 15. *See* §1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to §1B1.3). The use of the shotgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsections (b)(6)(B) and (c)(1). *See* §1B1.3(a)(4) ("any other information specified in the applicable guideline").

(ii) **Firearm Not Cited in the Offense of Conviction.** Defendant B's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant B unlawfully possessed a handgun (not cited in the offense of conviction) and used the handgun in connection with a robbery.

**Subsection (b)(6)(B).** In determining whether subsection (b)(6)(B) applies, the threshold question for the court is whether the two unlawful possession offenses (the shotgun on October 15 and the handgun on February 10) were "part of the same course of conduct or common scheme or plan". *See* §1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to §1B1.3).

If they were, then the handgun possession offense is relevant conduct to the shotgun possession offense, and the use of the handgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsection (b)(6)(B). *See* §1B1.3(a)(4) ("any other information specified in the applicable guideline"). Accordingly, subsection (b)(6)(B) applies.

On the other hand, if the court determines that the two unlawful possession offenses were not "part of the same course of conduct or common scheme or plan," then the handgun possession offense is not relevant conduct to the shotgun possession offense and subsection (b)(6)(B) does not apply.

**Subsection (c)(1).** Under these circumstances, the cross reference in subsection (c)(1) does not apply, because the handgun was not cited in the offense of conviction.

15. **Certain Convictions Under 18 U.S.C. §§ 922(a)(6), 922(d), and 924(a)(1)(A).**—In a case in which the defendant is convicted under 18 U.S.C. §§ 922(a)(6), 922(d), or 924(a)(1)(A), a downward departure may be warranted if (A) none of the enhancements in subsection (b) apply, (B) the defendant was motivated by an intimate or familial relationship or by threats or fear to commit

the offense and was otherwise unlikely to commit such an offense, and (C) the defendant received no monetary compensation from the offense.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendment 189); November 1, 1990 (amendment 333); November 1, 1991 (amendment 374); November 1, 1992 (amendment 471); November 1, 1993 (amendment 478); November 1, 1995 (amendment 522); November 1, 1997 (amendments 568 and 575); November 1, 1998 (amendments 578 and 586); November 1, 2000 (amendment 605); November 1, 2001 (amendments 629–631); November 1, 2004 (amendment 669); November 1, 2005 (amendments 679 and 680); November 1, 2006 (amendments 686, 691, and 696); November 1, 2007 (amendment 707); November 1, 2010 (amendment 746); November 1, 2011 (amendment 753); November 1, 2014 (amendment 784); November 1, 2015 (amendments 790 and 797); November 1, 2016 (amendment 804). |

## §2K2.2. [Deleted]

| | |
|---|---|
| *Historical Note* | Section 2K2.2 (Unlawful Trafficking and Other Prohibited Transactions Involving Firearms), effective November 1, 1987, amended effective January 15, 1988 (amendment 34), November 1, 1989 (amendment 189), and November 1, 1990 (amendment 333), was deleted by consolidation with §2K2.1 effective November 1, 1991 (amendment 374). |

## §2K2.3. [Deleted]

| | |
|---|---|
| *Historical Note* | Section 2K2.3 (Receiving, Transporting, Shipping or Transferring a Firearm or Ammunition With Intent to Commit Another Offense, or With Knowledge that It Will Be Used in Committing Another Offense), effective November 1, 1989 (amendment 189), was deleted by consolidation with §2K2.1 effective November 1, 1991 (amendment 374). A former §2K2.3 (Prohibited Transactions in or Shipment of Firearms and Other Weapons), effective November 1, 1987, was deleted by consolidation with §2K2.2 effective November 1, 1989 (amendment 189). |

## §2K2.4.    Use of Firearm, Armor-Piercing Ammunition, or Explosive During or in Relation to Certain Crimes

(a)    If the defendant, whether or not convicted of another crime, was convicted of violating section 844(h) of title 18, United States Code, the guideline sentence is the term of imprisonment required by statute. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply to that count of conviction.

(b)    Except as provided in subsection (c), if the defendant, whether or not convicted of another crime, was convicted of violating section 924(c) or section 929(a) of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute. Chapters Three and Four shall not apply to that count of conviction.

(c)    If the defendant (1) was convicted of violating section 924(c) or section 929(a) of title 18, United States Code; and (2) as a result of that conviction (alone or in addition to another offense of conviction), is determined

A-10

**§5K1.2**

significance of assistance can involve a broad spectrum of conduct that must be evaluated by the court on an individual basis. Latitude is, therefore, afforded the sentencing judge to reduce a sentence based upon variable relevant factors, including those listed above. The sentencing judge must, however, state the reasons for reducing a sentence under this section. 18 U.S.C. § 3553(c). The court may elect to provide its reasons to the defendant *in camera* and in writing under seal for the safety of the defendant or to avoid disclosure of an ongoing investigation.

| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendment 290). |
|---|---|

## §5K1.2.   Refusal to Assist (Policy Statement)

A defendant's refusal to assist authorities in the investigation of other persons may not be considered as an aggravating sentencing factor.

| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendment 291). |
|---|---|

\* \* \* \* \*

## 2.   OTHER GROUNDS FOR DEPARTURE

| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1990 (amendment 358). |
|---|---|

## §5K2.0.   Grounds for Departure (Policy Statement)

(a)   UPWARD DEPARTURES IN GENERAL AND DOWNWARD DEPARTURES IN CRIMINAL CASES OTHER THAN CHILD CRIMES AND SEXUAL OFFENSES.—

(1)   IN GENERAL.—The sentencing court may depart from the applicable guideline range if—

(A)   in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance; or

(B)   in the case of child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(2)(A)(i), that there exists an aggravating circumstance,

of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.

(2) DEPARTURES BASED ON CIRCUMSTANCES OF A KIND NOT ADEQUATELY TAKEN INTO CONSIDERATION.—

(A) IDENTIFIED CIRCUMSTANCES.—This subpart (Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)) identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range (*e.g.*, as a specific offense characteristic or other adjustment). If any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart may be warranted.

(B) UNIDENTIFIED CIRCUMSTANCES.—A departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence.

(3) DEPARTURES BASED ON CIRCUMSTANCES PRESENT TO A DEGREE NOT ADEQUATELY TAKEN INTO CONSIDERATION.—A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

(4) DEPARTURES BASED ON NOT ORDINARILY RELEVANT OFFENDER CHARACTERISTICS AND OTHER CIRCUMSTANCES.—An offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination only if such offender characteristic or other circumstance is present to an exceptional degree.

(b) DOWNWARD DEPARTURES IN CHILD CRIMES AND SEXUAL OFFENSES.—Under 18 U.S.C. § 3553(b)(2)(A)(ii), the sentencing court may impose a sentence below the range established by the applicable guidelines only if the court finds that there exists a mitigating circumstance of a kind, or to a degree, that—

(1)  has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, United States Code, taking account of any amendments to such sentencing guidelines or policy statements by act of Congress;

(2)  has not adequately been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(3)  should result in a sentence different from that described.

The grounds enumerated in this Part K of Chapter Five are the sole grounds that have been affirmatively and specifically identified as a permissible ground of downward departure in these sentencing guidelines and policy statements. Thus, notwithstanding any other reference to authority to depart downward elsewhere in this Sentencing Manual, a ground of downward departure has not been affirmatively and specifically identified as a permissible ground of downward departure within the meaning of section 3553(b)(2) unless it is expressly enumerated in this Part K as a ground upon which a downward departure may be granted.

(c)  LIMITATION ON DEPARTURES BASED ON MULTIPLE CIRCUMSTANCES.—The court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure, only if—

(1)  such offender characteristics or other circumstances, taken together, make the case an exceptional one; and

(2)  each such offender characteristic or other circumstance is—

(A)  present to a substantial degree; and

(B)  identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted.

(d)  PROHIBITED DEPARTURES.—Notwithstanding subsections (a) and (b) of this policy statement, or any other provision in the guidelines, the court may not depart from the applicable guideline range based on any of the following circumstances:

(1)  Any circumstance specifically prohibited as a ground for departure in §§5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status), 5H1.12 (Lack of Guidance as a Youth and Similar Cir-

cumstances), the last sentence of 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction), and the last sentence of 5K2.12 (Coercion and Duress).

(2) The defendant's acceptance of responsibility for the offense, which may be taken into account only under §3E1.1 (Acceptance of Responsibility).

(3) The defendant's aggravating or mitigating role in the offense, which may be taken into account only under §3B1.1 (Aggravating Role) or §3B1.2 (Mitigating Role), respectively.

(4) The defendant's decision, in and of itself, to plead guilty to the offense or to enter a plea agreement with respect to the offense (*i.e.*, a departure may not be based merely on the fact that the defendant decided to plead guilty or to enter into a plea agreement, but a departure may be based on justifiable, non-prohibited reasons as part of a sentence that is recommended, or agreed to, in the plea agreement and accepted by the court. *See* §6B1.2 (Standards for Acceptance of Plea Agreement).

(5) The defendant's fulfillment of restitution obligations only to the extent required by law including the guidelines (*i.e.*, a departure may not be based on unexceptional efforts to remedy the harm caused by the offense).

(6) Any other circumstance specifically prohibited as a ground for departure in the guidelines.

(e) REQUIREMENT OF SPECIFIC WRITTEN REASONS FOR DEPARTURE.—If the court departs from the applicable guideline range, it shall state, pursuant to 18 U.S.C. § 3553(c), its specific reasons for departure in open court at the time of sentencing and, with limited exception in the case of statements received *in camera*, shall state those reasons with specificity in the statement of reasons form.

**Commentary**

**Application Notes:**

1. **Definitions.**—For purposes of this policy statement:

   "*Circumstance*" includes, as appropriate, an offender characteristic or any other offense factor.

   "*Depart*", "*departure*", "*downward departure*", and "*upward departure*" have the meaning given those terms in Application Note 1 of the Commentary to §1B1.1 (Application Instructions).

A-14

**§5K2.0**

2. **Scope of this Policy Statement.—**

   (A) **Departures Covered by this Policy Statement.—**This policy statement covers departures from the applicable guideline range based on offense characteristics or offender characteristics of a kind, or to a degree, not adequately taken into consideration in determining that range. *See* 18 U.S.C. § 3553(b).

      Subsection (a) of this policy statement applies to upward departures in all cases covered by the guidelines and to downward departures in all such cases except for downward departures in child crimes and sexual offenses.

      Subsection (b) of this policy statement applies only to downward departures in child crimes and sexual offenses.

   (B) **Departures Covered by Other Guidelines.—**This policy statement does not cover the following departures, which are addressed elsewhere in the guidelines: (i) departures based on the defendant's criminal history (*see* Chapter Four (Criminal History and Criminal Livelihood), particularly §4A1.3 (Departures Based on Inadequacy of Criminal History Category)); (ii) departures based on the defendant's substantial assistance to the authorities (*see* §5K1.1 (Substantial Assistance to Authorities)); and (iii) departures based on early disposition programs (*see* §5K3.1 (Early Disposition Programs)).

3. **Kinds and Expected Frequency of Departures under Subsection (a).—**As set forth in subsection (a), there generally are two kinds of departures from the guidelines based on offense characteristics and/or offender characteristics: (A) departures based on circumstances of a kind not adequately taken into consideration in the guidelines; and (B) departures based on circumstances that are present to a degree not adequately taken into consideration in the guidelines.

   (A) **Departures Based on Circumstances of a Kind Not Adequately Taken into Account in Guidelines.—**Subsection (a)(2) authorizes the court to depart if there exists an aggravating or a mitigating circumstance in a case under 18 U.S.C. § 3553(b)(1), or an aggravating circumstance in a case under 18 U.S.C. § 3553(b)(2)(A)(i), of a kind not adequately taken into consideration in the guidelines.

      (i) **Identified Circumstances.—**This subpart (Chapter Five, Part K, Subpart 2) identifies several circumstances that the Commission may have not adequately taken into consideration in setting the offense level for certain cases. Offense guidelines in Chapter Two (Offense Conduct) and adjustments in Chapter Three (Adjustments) sometimes identify circumstances the Commission may have not adequately taken into consideration in setting the offense level for offenses covered by those guidelines. If the offense guideline in Chapter Two or an adjustment in Chapter Three does not adequately take that circumstance into consideration in setting the offense level for the offense, and only to the extent not adequately taken into consideration, a departure based on that circumstance may be warranted.

      (ii) **Unidentified Circumstances.—**A case may involve circumstances, in addition to those identified by the guidelines, that have not adequately been taken into consideration by the Commission, and the presence of any such circumstance may warrant departure from the guidelines in that case. However, inasmuch as the Commission has continued to monitor and refine the guidelines since their inception to take into consideration relevant circumstances in sentencing, it is expected that departures based on such unidentified circumstances will occur rarely and only in exceptional cases.

**A-15**

(B)   **Departures Based on Circumstances Present to a Degree Not Adequately Taken into Consideration in Guidelines.—**

    (i)   **In General.—**Subsection (a)(3) authorizes the court to depart if there exists an aggravating or a mitigating circumstance in a case under 18 U.S.C. § 3553(b)(1), or an aggravating circumstance in a case under 18 U.S.C. § 3553(b)(2)(A)(i), to a degree not adequately taken into consideration in the guidelines. However, inasmuch as the Commission has continued to monitor and refine the guidelines since their inception to determine the most appropriate weight to be accorded the mitigating and aggravating circumstances specified in the guidelines, it is expected that departures based on the weight accorded to any such circumstance will occur rarely and only in exceptional cases.

    (ii)   **Examples.—**As set forth in subsection (a)(3), if the applicable offense guideline and adjustments take into consideration a circumstance identified in this subpart, departure is warranted only if the circumstance is present to a degree substantially in excess of that which ordinarily is involved in the offense. Accordingly, a departure pursuant to §5K2.7 for the disruption of a governmental function would have to be substantial to warrant departure from the guidelines when the applicable offense guideline is bribery or obstruction of justice. When the guideline covering the mailing of injurious articles is applicable, however, and the offense caused disruption of a governmental function, departure from the applicable guideline range more readily would be appropriate. Similarly, physical injury would not warrant departure from the guidelines when the robbery offense guideline is applicable because the robbery guideline includes a specific adjustment based on the extent of any injury. However, because the robbery guideline does not deal with injury to more than one victim, departure may be warranted if several persons were injured.

(C)   **Departures Based on Circumstances Identified as Not Ordinarily Relevant.—**Because certain circumstances are specified in the guidelines as not ordinarily relevant to sentencing (*see, e.g.,* Chapter Five, Part H (Specific Offender Characteristics)), a departure based on any one of such circumstances should occur only in exceptional cases, and only if the circumstance is present in the case to an exceptional degree. If two or more of such circumstances each is present in the case to a substantial degree, however, and taken together make the case an exceptional one, the court may consider whether a departure would be warranted pursuant to subsection (c). Departures based on a combination of not ordinarily relevant circumstances that are present to a substantial degree should occur extremely rarely and only in exceptional cases.

In addition, as required by subsection (e), each circumstance forming the basis for a departure described in this subdivision shall be stated with specificity in the statement of reasons form.

4.   **Downward Departures in Child Crimes and Sexual Offenses.—**

(A)   **Definition.—**For purposes of this policy statement, the term "*child crimes and sexual offenses*" means offenses under any of the following: 18 U.S.C. § 1201 (involving a minor victim), 18 U.S.C. § 1591, or chapter 71, 109A, 110, or 117 of title 18, United States Code.

(B)   **Standard for Departure.—**

    (i)   **Requirement of Affirmative and Specific Identification of Departure Ground.—**The standard for a downward departure in child crimes and sexual offenses differs from the standard for other departures under this policy statement in

**A-16**

**§5K2.0**

that it includes a requirement, set forth in 18 U.S.C. § 3553(b)(2)(A)(ii)(I) and subsection (b)(1) of this guideline, that any mitigating circumstance that forms the basis for such a downward departure be affirmatively and specifically identified as a ground for downward departure in this part (*i.e.*, Chapter Five, Part K).

(ii)  **Application of Subsection (b)(2).**—The commentary in Application Note 3 of this policy statement, except for the commentary in Application Note 3(A)(ii) relating to unidentified circumstances, shall apply to the court's determination of whether a case meets the requirement, set forth in subsection 18 U.S.C. § 3553(b)(2)(A)(ii)(II) and subsection (b)(2) of this policy statement, that the mitigating circumstance forming the basis for a downward departure in child crimes and sexual offenses be of kind, or to a degree, not adequately taken into consideration by the Commission.

5.  **Departures Based on Plea Agreements.**—Subsection (d)(4) prohibits a downward departure based only on the defendant's decision, in and of itself, to plead guilty to the offense or to enter a plea agreement with respect to the offense. Even though a departure may not be based merely on the fact that the defendant agreed to plead guilty or enter a plea agreement, a departure may be based on justifiable, non-prohibited reasons for departure as part of a sentence that is recommended, or agreed to, in the plea agreement and accepted by the court. *See* §6B1.2 (Standards for Acceptance of Plea Agreements). In cases in which the court departs based on such reasons as set forth in the plea agreement, the court must state the reasons for departure with specificity in the statement of reasons form, as required by subsection (e).

**Background:** This policy statement sets forth the standards for departing from the applicable guideline range based on offense and offender characteristics of a kind, or to a degree, not adequately considered by the Commission. Circumstances the Commission has determined are not ordinarily relevant to determining whether a departure is warranted or are prohibited as bases for departure are addressed in Chapter Five, Part H (Offender Characteristics) and in this policy statement. Other departures, such as those based on the defendant's criminal history, the defendant's substantial assistance to authorities, and early disposition programs, are addressed elsewhere in the guidelines.

As acknowledged by Congress in the Sentencing Reform Act and by the Commission when the first set of guidelines was promulgated, "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." (*See* Chapter One, Part A). Departures, therefore, perform an integral function in the sentencing guideline system. Departures permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing. Departures also help maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B). By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so, along with appellate cases reviewing these departures, the Commission can further refine the guidelines to specify more precisely when departures should and should not be permitted.

As reaffirmed in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the "PROTECT Act", Public Law 108–21), circumstances warranting departure should be rare. Departures were never intended to permit sentencing courts to substitute their policy judgments for those of Congress and the Sentencing Commission. Departure in such circumstances would produce unwarranted sentencing disparity, which the Sentencing Reform Act was designed to avoid.

**A-17**

In order for appellate courts to fulfill their statutory duties under 18 U.S.C. § 3742 and for the Commission to fulfill its ongoing responsibility to refine the guidelines in light of information it receives on departures, it is essential that sentencing courts state with specificity the reasons for departure, as required by the PROTECT Act.

This policy statement, including its commentary, was substantially revised, effective October 27, 2003, in response to directives contained in the PROTECT Act, particularly the directive in section 401(m) of that Act to—

"(1) review the grounds of downward departure that are authorized by the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission; and

(2) promulgate, pursuant to section 994 of title 28, United States Code—

(A) appropriate amendments to the sentencing guidelines, policy statements, and official commentary to ensure that the incidence of downward departures is substantially reduced;

(B) a policy statement authorizing a departure pursuant to an early disposition program; and

(C) any other conforming amendments to the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission necessitated by the Act, including a revision of . . . section 5K2.0".

The substantial revision of this policy statement in response to the PROTECT Act was intended to refine the standards applicable to departures while giving due regard for concepts, such as the "heartland", that have evolved in departure jurisprudence over time.

Section 401(b)(1) of the PROTECT Act directly amended this policy statement to add subsection (b), effective April 30, 2003.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective June 15, 1988 (amendment 57); November 1, 1990 (amendment 358); November 1, 1994 (amendment 508); November 1, 1997 (amendment 561); November 1, 1998 (amendment 585); April 30, 2003 (amendment 649); October 27, 2003 (amendment 651); November 1, 2008 (amendment 725); November 1, 2010 (amendment 739); November 1, 2011 (amendment 757); November 1, 2012 (amendment 770). |

## §5K2.1.   Death (Policy Statement)

If death resulted, the court may increase the sentence above the authorized guideline range.

Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of